Case number 11-1451, Constellation Energy Commodities Group, Inc. et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Young, Petitioner, Ms. Pacella, for the respondent. Thank you, Mr. Young. Thank you, Mr. Young. Thank you, Mr. Young. Good morning. May it please the Court, Andrew Young, on behalf of the Petitioner, referred to hereinafter as Constellation. I'd like to reserve two minutes for rebuttal. This petition for review involves certain FERC orders that eliminated electric transmission rate, known as a through-and-out rate, and replaced it with a new mechanism known as the SECA under Section 206 of the Federal Power Act. As the ultimate beneficiary of the elimination of through-and-out rates, FERC imposed SECA charges on load-serving entities. However, in paragraph 45 of FERC... May I just ask a fact question? Sure. The SECA is paid to the RTO, or who is it paid to? The SECA gets paid, yes, it's collected by the RTO and then disbursed out to the transmission owners. But not based on whether they carried in any particular circumstance. I'm sorry, say that again? Without respect to whether they were the transmitter of a particular load. That's the way they solve the economic problem. Yeah, they file their revenue requirements for their transmission facilities as part of the RTO rates, as it were. So, however, in paragraph 45 of FERC's November 2003 order, FERC recognized the concern of some parties that generators may benefit from the elimination of through-and-out rates, and those savings may not all be passed on to load-serving entities. Therefore, FERC listed four remedies to this concern, the last of which allowed load-serving entities under existing contracts to deliver power that continue into the transition period to demonstrate to the suppliers and shipper facilities transactions, and to propose that the supplier be required to pay the SECA for that portion of the load-serving entity's load served by the contract. Constellation challenges FERC's subsequent orders, which permitted the Michigan cities to shift their SECA liabilities to Constellation under the so-called shift-to-shipper mechanism. Was Constellation a party to the proceeding that led to paragraph 45? Were they a party to the proceeding for November 2003 order? Yeah, I believe they were. They had intervened and were a party to that proceeding. So, under the name Constellation, or was it a different name? There have been several changes in names, Your Honor. They originally were Constellation Power Source, and then they were Constellation Energy Commodities Group, and now, of course, are Exelon Generation. So we'd have to check and see under which name. As an initial jurisdictional matter, FERC argues that certain of Constellation's arguments represent a collateral attack on the November 2003 order. There are two considerations necessary to determine whether Constellation's arguments represent a collateral attack. FERC, was Constellation agreed by FERC's order? Constellation argues that it was not agreed by the November 2003 order because paragraph 45 merely permitted load-serving entities to make such claims. Any injury to Constellation was conjectural or hypothetical. Was there any doubt that they would make such a claim? I mean, what possible reason would an LSC not want to shift the cost onto somebody else? Well, I mean, there are a lot of circumstances, I suppose. I mean, we were interpreting, you know, one sentence out of a loan order. It seems like, to me, LSCs would have had an incentive to shift. Yes. So unlike some of the other cases that we've talked about, such orders being conditional because we didn't know in the end whether something could be aimed at the person who's complaining. In this case, it seemed quite obvious that the LSCs would ultimately be trying to shift. Do you agree with that part? I agree generally that's true. I agree it depends on a lot of facts, though, Your Honor. If you look at one of the things in the record is Constellation's contingent notice regarding claims, and it lists a lot of parties, some of which filed claims, some of which withdrew claims, some of which were settled, some of which were litigated. There's also a lot of mentioned upstream contracts in there, some of which were pursued, some of which weren't. Settled and litigated doesn't really help, really, because they're only settled and litigated if they have some kind of claim. I understand. There were some that were withdrawn, too, Your Honor. Do we know why they were withdrawn? I can speculate, but there's nothing in the record that would indicate their intent. These are profit-making entities. These aren't nonprofits or charitable organizations. So at least from an economic point of view, they would like to shift the cost to somebody else if they could. Doesn't that seem right? I think generally that's true. So I understand your argument that your client could not have known that FERC was going to decide that Paragraph 45 did not have a benefits element at the end, but what about the client's concern about the cost causation principle, the ripple effect, those sorts of things? Wouldn't those have been matters that your client would have been aware of at the time? I'm sorry. Could you just rephrase that again? Well, as I understand your argument, you're saying that until Michigan City actually filed the claims, your client wasn't injured in fact. And so the question is, well, could you have foreseen, would a reasonable entity in your client's position have foreseen some of the issues that it's now raising and presented them to the agency at that time, either in a petition for rehearing? Well, that goes to sort of, I guess, the second argument, Your Honor, which is sort of reasonable notice, if that's what you're getting at. I'm just getting at your arguments. Yeah. So there's two parts to the argument. One is whether the injury was concrete enough at that point in time when it wasn't until two years later that they were actually notified of the claim and were given an opportunity to analyze the claim and the contracts under which those claims were made. So that's one argument. The second argument is as to whether or not FERC gave Constellation and other parties sufficient notice regarding these ship-to-shipper claims. So, you know, FERC argues that Paragraph 45 sets out four limited requirements for ship-to-shipper claims, and these requirements do not include benefits test. So they argue that reasonable notice was given. However, FERC's third required element demonstrated that the supplier is a shipper for such transactions. Constellation believes it does contain a benefits test. The term shipper is more commonly used in the natural gas industry where it refers to a customer seeking transportation service on a gas pipeline. So it's a little bit of an unusual term, but here in the electric context, we interpret it to mean a transmission customer seeking service from a transmission provider, or in this case the RTO. Now, in the context of Paragraph 45, though, we thought it made logical sense that that would be the transmission customer that imported power and thus benefited from FERC's elimination of throw-in-out rates. In fact, going back to the very first sentence of Paragraph 45, which explicitly says FERC recognizes the concern of some parties that generates new benefit, but yet now FERC is telling us that ship-to-shipper claims can be made regardless of benefit. So those are sort of the two arguments. One, the injury is not concrete and particularized, and two, that they weren't given sufficient notice. In fact, for a reasonable person standard, the ALJ found that FERC's interpretation was consistent with FERC's intent when drafting Paragraph 45. As for the merits, Consolation first challenges FERC's determination that the Michigan cities can ship their secret charges to Consolation. Consolation argued that in order to prevail on a ship-to-shipper claim, a load-serving entity should demonstrate the supplier as a shipper imported power and therefore benefited from FERC's elimination of throw-in-out rates. FERC rejected Consolation's argument and stated unequivocally that Paragraph 45 imposes no benefits test. Now, in order for FERC-approved rates to be just and reasonable, they must adhere to a principle of cost causation. So, quite simply, FERC's unequivocal declaration that the principle of cost causation does not apply to ship-to-shipper claims renders its imposition of secret charges on Consolation unjust and unreasonable. Can I just ask you to back up for one second? So, on this reasonable notice, your argument is that you didn't think Paragraph 45 applied to a company like Consolation. That was a reasonable notice question? No, the reasonable notice question was whether Paragraph 45, whether ship-to-shipper claims would include some kind of showing that you need to show a benefits test, the principle of cost causation. Oh, I understand that, but I thought you were making an argument on the difference between a shipper and a supplier or something like that. That's not what you were trying to do. Yeah, I think below, well, below what we were saying was, you know, look, if you only limit it to the contracted issue, and it's a delivery power contract, then therefore the supplier and the shipper are one and the same. So it can't mean that. Shipper has to mean, again, looking at the first sentence of Paragraph 45 in the reference to generators, it's got to look at the chain of supply, which goes from the generator or the source to the load or the sink. In this case, Consolation is a marketer who bought and resold. So this goes to the benefits part, but not to the argument that you didn't think this applied in some way to Consolation. What applied to Consolation? Paragraph 45. Paragraph 45. I mean, Paragraph 45 is ship-to-shipper claims that can be brought by the load-serving entities. Yes. Yes. So as to whether or not Firk's argument that so-called ripple claims were… No, I understand. Okay. I got that general point, but your point that 45 was allowing LSEs to make this shift, at least in the first instance, to somebody like Consolation, you're not saying that you don't think that applied at all. You don't think that Firk was saying that the ability of LSEs to shift the claim, at least of charge, at least in the first instance to Consolation, wasn't described in Paragraph 45? You agree that it was described in Paragraph 45? It was described in Paragraph 45. The question is whether the requirements of that ship-to-shipper claim were clearly identified in what Consolation put on reasonable notes. And right now you're talking about the requirements including who benefits. Yes. All right. Yes. So, you know, again, as to the merits, you know, first, it's a little disingenuous for Firk to say a benefits test can't apply because, of course, Firk's proof rates have to adhere to the principle of cost causation. Also, you know, this Court has held that an agency changing its course must apply a reasoned analysis indicating that its prior policies would be deliberately changed and not casually ignored. So then the question is whether that simple declaration, again, is a reasoned analysis justifying a departure from the principle of cost causation. Finally, we'd argue that Firk's decision was internally inconsistent because it relied on the principle of cost causation to impose secret charges on loads or entities but then ignores that same principle when it deals with these ship-to-shipper claims in Paragraph 45. The second argument is challenging Firk's reversal of the AOJ's finding that American Electric should be responsible for a portion of such secret charges. The AOJ have found that American Electric was a party in the chain of supply to the Michigan cities that was the shipper that benefited from personal energy through and out rates. However, Firk reversed the AOJ's finding by concluding that Paragraph 45 speaks of load-serving entities making such ship-to-shipper claims and Constellation is not a load-serving entity. Firk also found the initial decision attempts to support the notion of a rope claim using a benefits test, an idea that also has no basis in Paragraph 45. So again, for the same reasons, Your Honor, they're simply stating that the benefits test doesn't apply. So hard to see how the imposition of secret charges can be just and reasonable under those circumstances. Further, they've provided no reasoned explanation for deviating from the principle of cost causation. And then finally, they criticize the AOJ for being inconsistent, noting that the initial decision recognizes that a load-serving entity is not required to satisfy a benefits test and bring a ship-to-shipper claim, yet it relies upon the benefits test in allowing rope claims. However, Firk's determination results in a similar inconsistency, Your Honor, again, because it relied on the principle of cost causation imposed on LLCs, but then ignores it when allowing ship-to-shipper claims or defenses a ship-to-shipper claim in this instance. So the third argument- Let's be clear about this. You're not talking about being able yourself to lay off the charge onto AEP. You're using this as a defense against the LLC's claim, right? Yes. I mean, the notion of ripple claim is an unfortunate term. Whether it's a claim or whether it's a defense- Which part, the ripple or the claim? Both. Both, I suppose, Your Honor. We pursued it alternatively, either as a claim or as a defense, recognizing that the language in paragraph 45 said load-serving entities are the ones who can bring them. We always put forth that this was an appropriate defense, and both the ALJ and FERC recognized that we were using it as a defense. So third, Constellation challenges FERC's decision not to reduce the secret charges shifted to Constellation for purchases from MISA's Day 2 markets after April 1st. So except for the power purchased from American Electric, Constellation purchased all the remaining power needed to serve the Michigan cities after April 1st, 2005, from MISA's Day 2 markets. Constellation argued that secret charges should be reduced to account for the revenues lost as a result of the commencement of MISA Day 2's markets, an intervening event, if you will, rather than FERC's elimination of throw-out rates. However, FERC held that Michigan South Central has a long-term fixed-price, fixed-quantity contract with Constellation, which is unaffected by any energy market changes, and the record reveals no substantial difference in the amount of power purchased from Constellation that qualifies as a known and measurable change to test period data. Now, Constellation pointed out that FERC seemed to have misunderstood its argument. The argument wasn't that there was a change in the amount of power purchased by the Michigan cities from Constellation. The argument was there was a change in the power that was no longer being imported across the relevant scene and therefore didn't benefit from the elimination of throw-out rates. MISA's Day 2 markets are completely internal to MISA. So, I mean, Constellation benefited, if at all, because of a change in the markets. Irrespective of FERC's elimination of throw-out rates. FERC did not meaningfully respond to that argument. Fourth, Constellation's challenge is FERC's reversal of the AOJ's finding that ship-to-shipper claims Michigan South Central should be reduced by 21.8%. So, MSCPA had a peak load of approximately 120 megawatts, and it purchased 30 megawatts of power from Constellation. And MSC's remaining load of 90 megawatts was met through its own generation. So the amount of power Michigan South Central purchased from Constellation and generated itself exceeded what was needed to serve its load. Therefore, MSCPA resold a certain amount of power to third parties equal to 21.8%. Well, FERC's view was that, given the amount that they were producing, that it was consistent with them selling their own power and not Constellation's power. Is that right? Yes.  I believe so, Your Honor. So what's wrong with that? The argument was, Your Honor, that MSCPA had a burden of proof under Paragraph 45. Who does have the burden of proof here? Well, if we look at the language of Paragraph 45, it says, load-serving entities under existing contracts, it goes on, to propose that the supplier be required to pay the CEQA for that portion of the load-serving entities load-served by the contract. So the load-serving entity has to propose.  I'm sorry. Go ahead. I thought the FERC's point was it was only going to deviate from the test period data for known and measurable changes. That would suggest that the burden is on you to show that they didn't sell from their own generation. Well, the argument regarding or the point regarding the change to the test period data was regarding the development of the CEQA rates themselves. That was not necessarily related to shift-to-shipper claims, which is where the confusion, I think, lies. Because, again, our argument was that FERC failed to understand our argument, which was a burden of proof argument. So FERC was talking about development rates. We were talking about burden of proof under Paragraph 45. And that's why we think they didn't immediately respond. Because the ALJ found that Michigan South Central Power Agency agreed with Constellation and found that Michigan South Central Power Agency didn't provide any evidence, didn't even support an economic rationale, indicating that the power purchased from Constellation was used to serve its load. Therefore, it failed to meet its burden of proof. FERC reversed, and we challenged that. And we don't think FERC meaningfully responded to that. You're out of time. The last thing, I think, was Bay City, Your Honor. Were there any questions regarding the challenge for the Bay City claim? Thanks. We'll hear from FERC. Good morning, Your Honors. Beth Pasella for FERC. Could you just turn to this last point about who had the burden of proof in that proceeding and what was the, what's FERC's explanation for reversal of the? 21.8%. Correct. Yeah. I think that that's exactly what Your Honor was saying is exactly right, is that the way that it works with the 21.8%, the burden of proof is on the load-serving entity to propose that this happened. But then the, and then they propose it. And then the recipient of the proposed shift would then have to show that there was a known and measurable change to change that. And that's because, as Your Honor has already recognized, a load-serving entity seems to eliminate surcharges are calculated based on test period imports that use through and out service. That included the contract amounts in the contracted issue here between Constellation and Michigan South Central. So Michigan South Central was assessed seems elimination surcharges based on that, the volumes in that contract. And so it comes down to who is then going to be paying that secret charge. Is it going to be the load-serving entity that Paragraph 45 is directed to ensure that they don't double pay, which is what would have occurred. And so because their load didn't go down, there was no basis on which to, no one disagrees that their load didn't go down. So no decrease in load, no decrease in secret charge, no decrease in shift of the secret charge. That was the commission's analysis. I think if you look at petitioner's briefs, they just ignore the commission's point about known and measurable charges. So I don't think they really challenge that. They just don't acknowledge it, but the commission did. Thank you. If there are no further questions on that, I'll turn to the collateral attack issue. First, Your Honors, on benefits, if you look at Paragraph 45, the fourth mitigation measure in Paragraph 45, it includes simply four requirements to demonstrate that your seems elimination should be shifted. Can I be, on the collateral attack question, is it your position that, and there are two ways that Constellation could have challenged the meeting of Paragraph 45. One is to file a petition for rehearing with FERC. That's right, Your Honor. And two is to come into court. They couldn't have come into court at that point, and we certainly don't make a standing argument that they had standing at the time, because the first time the commission created this Paragraph 45 shift to shipper mechanism was in the November 17, 2003 order. So while that was- So they'd be having to file a petition for rehearing of an order on rehearing. Sure, absolutely, because it was a brand new, this was a new ruling. On rehearing of the, of 104 FERC- I have a vague memory that there's law about that when you have to file a petition for rehearing of a rehearing. What is the legal precedent? This is the exact circumstance where you would have to seek rehearing, because it's a brand new holding. in response to rehearing requests from 104 FERC 61105, which is at JA1116. That's the order underlying the November 17, 2003 order. And in that proceeding, the commission did find that through-and-out rates, pancake rates, are unjust and unreasonable, and ordered that the seams elimination surcharge be imposed instead. And parties started rehearing, and one of the things people brought up was, wow, you're not realizing if you do that, we load-serving entities are going to be double-charged. And the commission in Paragraph 45 of the November 17, 2003 order remedied that for the first time, came in and set up this new shift to shipper mechanism. So the first time it came about was in the November 17, 2003 order. Therefore, as the commission found, if there were any concerns about that, causation concerns, whether the ambiguity about whether there was a benefits test that was plainly not listed in the four criteria set out in that test, that's the exact kind of thing that this Court has said. For example, in Dominion at 286F3 at 589, ambiguity is not enough to excuse Constellation's failure to seek rehearing. And at best, it's ambiguous that there's a benefits test in the shift-to-shift mechanism in Paragraph 45. At best. And I think what Judge Rogers was intimating before was there's not even at best the intimation of possibility of a ripple claim. So that's not even really an ambiguity issue, but if it's a cost causation issue, they did need to come to the commission and say, just like the parties did on rehearing of 104FER, you are not recognizing that there's a cost causation problem. We're going to be double-charged. And that would have been the simple thing to do, and this proceeding might not be here. The whole thing, the commission may well have resolved that concern in their favor if it had been presented to them. Thank you. Further questions? No further questions. Thank you very much. Does the commission have any time? We'll give you another minute if you'd like.  You know, again, for the MSCPA and the 21.8% reduction, no decrease in loads and, therefore, no decrease in secret charges, you know, wasn't the issue that was arguable for the ALJ, and the ALJ decided and the FERC reversed on it, which was the burden of proof issue, which is, again, why we think they didn't meanfully respond. And I don't know how a decrease in load answers that question. No decrease in load answers that question. We certainly never argued that there was a decrease in load. As for collateral attack, I would just say that the FERC would have you believe that this was a non-conditional order. It was, you know, as they acknowledged, they had created shiftable claims for the first time, and no claims had yet been filed. It was clearly contingent on future events, the filing of such claims. So that's all I have. We'll take the matter under submission, then. Thank you very much.
judges: Garland, Rogers, Randolph